J-A06025-16

2017 PA Super 25

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| LETITIA DENISE SMALLWOOD | |
| Appellee | No. 709 MDA 2015 |

Appeal from the Order Entered April 20, 2015
In the Court of Common Pleas of Cumberland County
Criminal Division at No(s): CP-21-CR-0000088-1972

BEFORE:   LAZARUS, J., STABILE, J., and DUBOW, J.

OPINION BY LAZARUS, J.:                    **FILED FEBRUARY 01, 2017**

The Commonwealth of Pennsylvania appeals from the order, entered in the Court of Common Pleas of Cumberland County, granting Letitia Denise Smallwood's petition filed pursuant to the Post-Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541–9546. After careful review, we are constrained to conclude Smallwood has not satisfied the newly-discovered facts exception under section 9545(b)(1)(ii) of the PCRA, and, therefore, the PCRA court did not have jurisdiction to address the merits of Smallwood's petition.   We, therefore, reverse the PCRA court's order granting a new trial.[1]

---

[1] On September 30, 2016, and January 11, 2017, Smallwood filed motions for leave to file post-submission communications (supplemental authority). We grant both motions.   *See* Pa.R.A.P. 2501(a).   Two prior motions for leave to file post-submission communications were filed on March 18, 2016

*(Footnote Continued Next Page)*

On January 11, 1973, a jury convicted Smallwood of one count of arson[2] and two counts of first-degree murder.[3] The court sentenced Smallwood to concurrent terms of ten to twenty years' imprisonment on the arson count and life imprisonment on each murder count. Smallwood filed post-trial motions, which were denied. The Pennsylvania Supreme Court denied Smallwood's direct appeal[4] on January 29, 1976. ***Commonwealth v. Smallwood***, 350 A.2d 822 (Pa. 1976).

*(Footnote Continued)* ─────────

and August 5, 2016; those motions were granted by this Court by separate orders, dated March 24, 2016, and August 8, 2016.

[2] 18 Pa.C.S. § 2502(d).

[3] 18 Pa.C.S. § 3301(a)(2).

[4] ***See*** Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, art. II, § 202(1), 17 P.S. § 211.202(1) (Supp. 1975), modified by Supreme Court Rule 73 of 1975, reenacted at 42 Pa.C.S.A. § 722. Prior to the Act of September 23, 1980, P.L. 686, No. 137, § 1, effective November 22, 1980 (Act 137 of 1980), Section 722 of the Judicial Code included among the classes of cases within the Supreme Court's exclusive jurisdiction, under the former version of its subsection (1), "Felonious homicide." Act No. 137 of 1980, which amended Section 722 of the Judicial Code into its present form, had as a prime purpose relieving the Supreme Court of the burden of dealing with all appeals in cases of felonious homicide. Recognizing the increased burden the removal of these and other matters from the Supreme Court's jurisdiction would have on the Superior Court, the legislature passed the Act of June 11, 1980, P.L. 213, No. 63, 42 Pa.C.S. § 541, which increased the size of Superior Court from seven to fifteen members. In Act 137, the legislature also rewrote Section 722(4) of the Judicial Code to insure by explicit requirement that an automatic, searching and independent review of all death sentences would be available in the Supreme Court on a mandatory basis, in accordance with Section 9711(h) of the Sentencing Code.

Smallwood's first post-conviction petition was denied in 1979. The Pennsylvania Supreme Court affirmed the PCRA court's order denying relief. **See Commonwealth v. Smallwood**, 442 A.2d 222 (Pa. 1982).

In 1999, Smallwood saw a television program that featured Dr. Gerald Hurst, a chemist and renowned arson expert. In her certification, Smallwood stated that in that program, "Dr. Hurst explained the advances that had been made in the field of fire investigation and also explained how he had assisted a woman charged with a crime similar to the one I was get her conviction overturned." Petitioner's Certification, 5/15/14, at ¶ 11.

Fifteen years later, on March 14, 2014, Smallwood filed a second PCRA petition. The Commonwealth filed a motion to dismiss the petition as untimely and, in the alternative, previously litigated. On June 20, 2014, the PCRA court heard arguments. Thereafter, the court held an evidentiary hearing on December 15, 2014, and a merits hearing on March 27, 2015. On April 20, 2015, the PCRA court concluded that Smallwood had met her burden of proving the newly-discovered fact exception under section 9545(b)(1)(ii) of the PCRA. The PCRA court granted Smallwood a new trial. The Commonwealth filed a timely notice of appeal and now raises three issues for our review:

1. Whether the PCRA court erred because the petition is untimely[,] as a "new" expert opinion based on old methodology and facts does not reset the sixty-day clock nor does expert shopping constitute due diligence?

2. Whether the PCRA court erred in granting petitioner a new trial because the after-discovered evidence would be used

- 3 -

solely to impeach the credibility of Commonwealth witnesses?

3. Whether the PCRA court erred in granting petitioner a new trial because the after-discovered evidence would not likely result in a new trial?

Commonwealth's Brief, at 5.

The PCRA court summarized the underlying facts as follows:

In the early morning hours of August 29, 1971, a fire raged through the property at 11 North Pitt Street in the Borough of Carlisle, Cumberland County, Pennsylvania. The property consisted of two offices on the first floor and apartments on the second and third floors. As a result of the fire, two tenants residing in apartments on the third floor were killed.

William H. Sweet, a Deputy Fire Marshal with the Pennsylvania State Police performed the fire investigation. He arrested [Smallwood] on September 4, 1972.

The Commonwealth's case against [Smallwood] was composed primarily of circumstantial evidence. This circumstantial evidence included both findings from the fire investigation as well as evidence that [Smallwood] possessed the means, motive and opportunity to commit the arson.

At trial, Trooper Sweet testified that the fire was incendiary. His opinion was based largely on eyewitness testimony which suggested that the fire had "started in two separate places without interconnecting trails." Although the eyewitness testimony was imprecise with regard to the timing of when each saw the fire, Trooper Sweet determined that the fire "started in two separate places." Through his investigation, however, he was not able to learn precisely what caused the fire. Nevertheless, he did opine that it was arson.

At the evidentiary hearing held in connection with the instant petition, Dr. Jason Sutula testified on behalf of [Smallwood]. He was qualified as an expert in the field of fire investigation. He identified the National Fire Protection Association Publication 921

("NFPA 921")[5] as the "gold standard" for fire investigators. It was first published in 1992 and has been revised numerous times since then. Applying the methodology of NFPA 921 to this case, Dr. Sutula took issue with Trooper Sweet's conclusions 1) that the fire was arson; and 2) that there were two points of origin.

Initially, Dr. Sutula pointed out that Trooper Sweet's classification of the fire as incendiary was "premature." He went on to explain that pursuant to NFPA 921 principles, a fire cannot be classified as incendiary until other potential causes have been considered and ruled out. Potential causes in this case included a malfunction of the building's electrical system as well as an accidental ignition of discarded furniture and trash in the halls due to carelessly discarded smoking materials. Applying the principles of NFPA 921 to the available evidence, Dr. Sutula concluded that the cause of this fire must be classified as "undetermined."

Further, Dr. Sutula pointed out that the original investigation was not sufficient to determine that there was a second point of origin on the third floor. It should be noted that Dr. Sutula acknowledged that Trooper Sweet's original investigation was acceptable according to the methodology of fire investigation in

---

5 The NFPA 921 is a guide for "scientific-based investigation and analysis of fire and explosion incidents . . . [and] the foremost guide for rendering accurate opinions as to incident origin, cause, responsibility, and prevention." NFPA 921 covers "[a]ll aspects of fire and explosion investigation . . . from basic methodology to collecting evidence to failure analysis. Guidelines apply to all types of incidents from residential fires and motor vehicle fires to management of complex investigations such as high-rise fires and industrial plant explosions." The purpose of NFPA 921 is "to assist individuals who are charged with the responsibility of investigating and analyzing fire and explosion incidents and rendering opinions as to the origin, cause, responsibility, or prevention of such incidents, and the damage and injuries which arise from such incidents." *NFPA 921: Guide for Fire and Explosion Investigators, National Fire Protection Association*, http://www.nfpa.org/codes-and-standards/all-codes-and-standards/list-of-codes-and-standards?mode=code&code=921 (last visited Jan. 17, 2017).

> 1972. However, fire investigation at that time was more of an "art" than a science.

PCRA Court Opinion, 7/27/15, at 1-4.

Our standard of review for an order denying post-conviction relief is limited to examining whether the PCRA court's determination is supported by evidence of record and whether it is free of legal error. *Commonwealth v. Jermyn*, 709 A.2d 849, 856 (Pa. 1998); *Commonwealth v. Wilson*, 824 A.2d 331 (Pa. Super. 2003) (*en banc*). The scope of our review is limited to the findings of the PCRA court and the evidence of record, viewed in the light most favorable to the prevailing party at the trial level. *Commonwealth v. Spotz*, 84 A.3d 294, 311 (Pa. 2014). A second or subsequent petition for post-conviction relief will not be entertained unless a strong prima facie showing is offered to demonstrate that a miscarriage of justice may have occurred. *Commonwealth v. Allen*, 732 A.2d 582, 586 (Pa. 1999). A prima facie showing of entitlement to relief is made "only by demonstrating either that the proceedings which resulted in conviction were so unfair that a miscarriage of justice occurred which no civilized society could tolerate, or the defendant's innocence of the crimes for which he was charged." *Commonwealth v. Ali*, 86 A.3d 173, 177 (Pa. 2014), citing *Allen*, 732 A.2d at 586.

Before addressing the merits of a PCRA petition, we must first determine whether the PCRA court had jurisdiction to entertain the underlying petition. *See Commonwealth v. Fahy*, 737 A.2d 214, 223 (Pa.

1999). A PCRA petition, including a second or subsequent petition, must be filed within one year of the date the judgment becomes final,[6] unless appellant can plead and prove one of three exceptions set forth under 42 Pa.C.S.A. § 9545(b)(1), and that the petition was filed within 60 days of the date the claim could have been presented. 42 Pa.C.S. § 9454(b)(2). **See Commonwealth v. Alcorn**, 703 A.2d 1054, 1056-57 (Pa. Super. 1997). These time limits are jurisdictional in nature, "implicating a court's very power to adjudicate a controversy." **Ali**, 86 A.3d at 177, citing **Fahy**, **supra**. Accordingly, the "period for filing a PCRA petition is not subject to the doctrine of equitable tolling[.]" **Fahy**, 737 A.2d at 222. Instead, the time for filing can be extended "only if the PCRA permits it to be extended, *i.e.*, by operation of one of the statutorily enumerated exceptions to the PCRA time-bar." **Ali**, 86 A.3d at 177, citing **Fahy**, 737 A.2d at 222.

_____

[6] A judgment of sentence "becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review." 42 Pa.C.S. § 9545(b)(3). **See** Pa.R.A.P. 1113(a) ("[A] petition for allowance of appeal shall be filed with the Prothonotary of the Supreme Court within 30 days of the entry of the order of the Superior Court sought to be reviewed."); U.S. Sup.Ct. Rule 13 ("[A] petition for writ of certiorari seeking review of a judgment of a lower state court that is subject to discretionary review by the state court of last resort is timely when filed with the clerk within ninety [90] days after entry of the order denying discretionary review."). The Pennsylvania Supreme Court denied Smallwood's direct appeal on January 29, 1976. Therefore, Smallwood's judgment of sentence became final on April 30, 1976, upon the expiration of the time to seek review in the United States Supreme Court. **See** U.S. Sup.Ct. Rule 13.

Our Supreme Court has repeatedly stated it is the petitioner's burden to allege and prove that one of the timeliness exceptions applies. ***See, e.g.***, ***Commonwealth v. Beasley***, 741 A.2d 1258, 1261 (Pa. 1999). The Commonwealth contends Smallwood has not carried this burden.

The PCRA provides, in relevant part:

(1) Any petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final, unless the petition alleges and the petition proves that:

    (i) The failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;

    (ii) **The facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence**; or

    (iii) The right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

(2) Any petition invoking an exception provided in paragraph (1) shall be filed within 60 days of the date the claim could have been presented.

42 Pa.C.S § 9545(b) (emphasis added).

As stated above, Smallwood's judgment of sentence became final 40 years ago; therefore, her petition is patently untimely. If, as the PCRA court

found, Smallwood's petition alleges and proves that her claim was predicated upon "newly[-]discovered facts that were unknown" and that those facts could not have been discovered sooner through the exercise of "due diligence," 42 Pa.C.S. §9545(b)(1)(ii), then "the PCRA court ha[d] jurisdiction over the claim under this subsection." **Commonwealth v. Bennett**, 930 A.2d 1264, 1270 (Pa. 2007) (footnote omitted). Additionally, Smallwood's petition invoking the newly-discovered fact exception was required to be "filed within 60 days of the date the claim could have been presented." 42 Pa.C.S. § 9545(b)(2). **See Commonwealth v. Albrecht**, 994 A.2d 1091 (Pa. 2010); **Commonwealth v. Marshall**, 947 A.2d 714, 720 (Pa. 2008).[7]

In her PCRA petition, Smallwood relies on Dr. Sutula's February 18, 2014 affidavit.[8] In his affidavit, Dr. Sutula applied the most recent edition of

---

[7] The goal of the PCRA is to provide relief to the wrongfully convicted by ferreting out colorable claims of wrongful convictions. 42 Pa.C.S. § 9541, *et seq*.

[8] Dr. Sutula holds a doctorate in Engineering from the College of Science and Engineering at the University of Edinburgh, Scotland, and both a Master of Science Degree and a Bachelor of Science Degree in Fire Protection Engineering from the University of Maryland. Doctor Sutula holds two certifications from the National Association of Fire Investigators (NAFI): he is a Certified Fire and Explosion Investigator (CFEI) and a Certified Fire Investigation Instructor (CFII).

the NFPA 921 standards[9] to the facts of Smallwood's case. Doctor Sutula stated:

> The most important result of the NFPA 921 technical committee's work, along with feedback from the general public, was a document that clearly outlined an accepted methodology for conducting sound fire and explosion investigations. Additionally, the first guide discredited many common misconceptions and "rules of thumb" that were routinely used to form opinions and conclusions about a given fire scene. . . . Currently, both of the organizations that certify fire investigators, NAFI and IAAI,[10] recognize NFPA 921 as the authoritative guide when performing a fire investigation. Both organizations have incorporated NFPA

---

[9] NFPA 921, *Guide for Fire and Explosion Investigation*, 2014 Edition.

[10] The International Association of Arson Investigators (IAAI) issued the following statement on January 12, 2013:

> It is the position of the International Association of Arson Investigators that National Fire Protection Association (NFPA) Document 921 is widely recognized as an authoritative guide for the fire investigation profession. In addition, NFPA 921 is an important reference manual, and sets forth guidance and methodology regarding the determination of the origin and cause of fires. This Association uses NFPA 921, along with other documents including NFPA 1033, as a foundation for its training and certification programs.
>
> The statement reaffirms the IAAI's long-standing recognition of the importance of NFPA 921 to the knowledge and methodology of fire investigation. "Authoritative" means the guide is an accepted source of information, and known to be accurate and reliable. By its own terms the document is not a "standard," and is subject to revision and updating on a periodic basis to allow it to remain current with the expanding scientific and technical knowledge in the fire investigation field.

NFPA 921/1033 Position Statement, https://www.firearson.com/NFPA-9211033-Position-Statement/Default.aspx (last visited Jan. 17, 2017).

921 as the foundation for their certification process, **recommend its methodology when conducting a fire investigation**, and use the document to generate questions that appear on their individual certification exams.

Affidavit of Jason A. Sutula, Ph.D., 2/18/15, at ¶¶ 17-21 (emphasis added). Doctor Sutula opined, to a reasonable degree of engineering and scientific certainty, that application of those standards indicates that Trooper Sweet's classification of the fire as incendiary was premature because two other possible causes of the fire, electrical and accidental, had not been ruled out. *Id*. at ¶¶ 35-41.

The PCRA court determined that the "newly[-]discovered facts" were Dr. Sutula's application of the NFPA 921 standards to the evidence available in this case. PCRA Court Opinion, 7/27/15, at 6-8. The court stated that from the time Smallwood saw the 1999 television program featuring Dr. Hurst, she "attempted to acquire more information on the current advances in fire science while trying to secure legal assistance to pursue her claim." *Id.* at 6. The PCRA court recounted Smallwood's decade-long effort to support her claim that "new science" would undermine Trooper Sweet's opinion that the fire was arson. *Id.*

Smallwood contacted Dr. Hurst, as well as attorney and law professor Thomas M. Place,[11] to discuss her case. Shortly after seeing Dr. Hurst on

_____

[11] Thomas M. Place, a member of the Pennsylvania bar and professor of law at Pennsylvania State University, The Dickinson School of Law, is the author of *The Pennsylvania Post-Conviction Relief Act—Practice and Procedure* *(Footnote Continued Next Page)*

television, she petitioned the court for copies of her transcripts and state police reports. She corresponded with Dr. Hurst throughout the spring of 1999, and corresponded with Professor Place, who agreed in 2000 to work on her case with Dr. Hurst.

Smallwood, incarcerated and indigent, attempted to reconstruct the floor plans of the building at 11 North Pitt Street, filing a Right to Know request in an attempt to obtain records from the Union Fire Company. She also contacted various agencies for investigative and legal assistance, including Susquehanna Legal Services, the Pennsylvania Institutional Law Project, the Defender Association of Philadelphia, the Innocence Institute at Point Park University, Spotlight Enterprises, Centurion Ministries, the Innocence Project in New York, and Associated Fire Consultants, Inc. ***See*** Evidentiary Hearing, 3/27/15, Certification of Letitia Smallwood, 5/15/14, Exhibit P-2, ¶ 24.

In March 2000, Centurion Ministries wrote to Smallwood, indicating Professor Place hoped to obtain a new trial for her with the help of Dr. Hurst. In May 2000, Dr. Hurst wrote to Smallwood and told her "she had not been forgotten," and that Professor Place was "looking for an additional expert in the area." ***Id.*** at ¶ 23(u).

---

*(Footnote Continued)* ———————————

(2016 11th ed.) and various other publications on post-conviction law in Pennsylvania.

In August 2002, Dr. Hurst wrote to Smallwood; he relayed to her that another expert had informed Professor Place that Dr. Hurst's approach to her case was not correct. Dr. Hurst acknowledged there was more than one way to approach the case, and emphasized she needed a competent attorney who understood post-conviction law. Because she knew Professor Place was an expert in that area, she "continued to rely on his commitment to [her] case." *Id.* at ¶ 23(ww).

In September 2004, Smallwood wrote to her friend, Ms. Grant, telling her that "Professor Place had just stopped working on my case[,]" asking her to help her find an attorney, and suggesting Dr. Hurst "testify through a deposition because of his poor health." *Id.* at ¶ 23(aaa). In June 2009, Smallwood again wrote to Ms. Grant, "expressing frustration that Professor Place had procrastinated about my case for ten years." *Id.* at ¶ 23(jjj).[12] On September 24, 2009, Smallwood wrote to the Pennsylvania Innocence Project asking for assistance with her case. *Id.* at ¶ 25.

In 2012, the Pennsylvania Innocence Project at Temple University Beasley School of Law contacted the Cumberland County District Attorney's Office and requested copies of any records remaining in the case file.

---

[12] The record is replete with references that Professor Place for years unsuccessfully sought assistance to discover additional information about the construction of the interior of the building. It was his opinion this information was essential for any expert to be able to call into question the trial testimony of the Commonwealth's expert.

Ultimately, the Innocence Project was notified on January 17, 2014 that Dr. Sutula had completed his review of the available records from Smallwood's case. Nilam A. Sanghvi, staff attorney at the Pennsylvania Innocence Project, certified that Dr. Sutula had informed him and his co-counsel, Joshua D. Snyder of Boni & Zack, LLC, "that he had completed his review of the available materials from Ms. Smallwood's case[.]" *See* Evidentiary Hearing, 3/27/15, Certification of Witness Pursuant to 42 Pa.C.S. § 9545(d)(1), 3/13/14, Exhibit P-95, at ¶ 2. Based on his review of the available documents, Attorney Sanghvi certified that Dr. Sutula had concluded that "Trooper Williams Sweet's testimony, and the evidence he relied on to reach it, were fundamentally unreliable in light of what is now known about fire investigations[.]" *Id.* at ¶ 3. Of note, Dr. Sutula stated that, "based on the evidence presented, it was impossible to say whether the fire was accidental or was intentionally set." *Id.*

The PCRA court concluded that Smallwood had met the due diligence component of the newly-discovered facts exception under section 9545(b)(1)(ii). The PCRA court also found that the sixty-day clock ran from February 18, 2014, the date Dr. Sutula submitted his affidavit to the Pennsylvania Innocence Project. Therefore, the PCRA court was satisfied that Smallwood had exercised due diligence in bringing her claim and that her petition, filed on March 14, 2014, within 60 days of the Dr. Sutula's affidavit, was timely filed. Quoting our Supreme Court and this Court, the PCRA court stated that the due diligence standard "requires neither perfect

- 14 -

vigilance nor punctilious care, based on the particular circumstances, to uncover facts that may support a claim for collateral relief[,]" yet "demands that the petitioner *take reasonable steps to protect [her] own interests*." PCRA Court Opinion, *supra* at 5, quoting **Commonwealth v. Hill**, 736 A.2d 578, 588 (Pa. 1999) (internal citations omitted) and **Commonwealth v. Marshall**, 947 A.2d 714, 720 (Pa. Super. 2008) (citation and punctuation omitted) (emphasis added).

The Commonwealth disputes the PCRA court's due diligence determination, arguing that what occurred between 1999 and 2014 was not due diligence or reasonable efforts, but instead, "years of attorney and expert shopping." Appellant's Brief, at 71. Essentially, the Commonwealth concedes that in 1972, the time of trial, arson investigation was more of an art than a science. Considerable advances made in the ensuing twenty years transformed the art of fire investigation into a science. Publication of NFPA 921, and its subsequent revisions, and application of its principles, are now critical to the determination of whether a fire was incendiary. The Commonwealth contends that Dr. Sutula's February 18, 2014 affidavit, which relied on the 2014 edition of the NFPA 921, is simply a "new" opinion based on "old methodology and facts[.]" Appellant's Brief, at 57. The Commonwealth claims that the petition is untimely because a "new" expert opinion based on old methodology and facts does not "reset" the clock, "nor does expert shopping constitute due diligence[.]" Commonwealth's Brief, at 4.

We are constrained to agree. Both Smallwood and the trial court misapprehend the focus of where due diligence is to be examined. Simply put, the methodology on which Dr. Sutula relies has been in the public domain since 1992, and Smallwood became aware of it through Dr. Hurst in 1999.

The NFPA 921 standard is the new fact in this case. As such, Smallwood had to demonstrate the standard was unknown to her and could not have been ascertained by the exercise of due diligence any earlier than 60 days before she filed her second PCRA petition. She has not demonstrated this; instead, the record reveals that after learning of NFPA 921 in 1999, Smallwood spent immense time and effort over the next fifteen years attempting to find evidence of the construction of the subject building so that her expert could offer an alternative theory as to the cause of the fire. If successful, an alternative theory would call into question -- and eliminate -- arson as a credible conclusion using the scientific method under NFPA 921. Of significance here, however, is that Smallwood did not have to establish an alternative theory for purposes of overcoming the timeliness exception; she simply needed to establish that application of the scientific method under NFPA 921 would lead to the conclusion that the cause of the fire in this case was undetermined.

Although Dr. Sutula's February 18, 2014 affidavit did contain newly-discovered facts that would permit the PCRA court to consider an otherwise untimely petition, we cannot conclude that Smallwood established that these

"facts" could not have been ascertained prior to 2014 with the exercise of due diligence. Smallwood put forth great effort, but we are unable to find that these steps over fifteen years were reasonable given the statutory time restrictions. What these efforts demonstrate is due diligence in attempting to unearth new evidence to support an alternative theory of the cause of the fire in this case after learning of the NFPA 921 standard. These efforts do not bear upon the existence and timing of Smallwood's knowledge of NFPA 921 through Dr. Hurst in 1999, the new fact in this case. Several recent cases are instructive.

In ***Commonwealth v. Cox***, 146 A.3d 221 (Pa. 2016), the defendant confessed to two murders, and the court joined the cases for trial in 1995. In addition to the defendant's confessions, the Commonwealth introduced the testimony of Philadelphia Police Officer James O'Hara, who had performed ballistics testing on bullets recovered from the victims' bodies. The jury convicted defendant of two counts of first-degree murder. Defendant was sentenced to life imprisonment for one murder and to death on the other. On direct appeal, the Supreme Court affirmed, ***Commonwealth v. Cox***, 728 A.2d 923 (Pa. 1999) and, thereafter, affirmed the denial of his first PCRA petition. ***Commonwealth v. Cox***, 983 A.2d 666 (Pa. 2009). Defendant filed a second PCRA petition, claiming counsel was ineffective for failing to have independent ballistics testing performed. Our Supreme Court held the defendant failed to establish that he had acted with

due diligence in seeking out ballistics evidence, and therefore had failed to prove an exception to the one-year time bar. The Court stated:

> Cox was required to establish that the fact upon which he bases his claim was unknown to him and that he could not have discovered it through due diligence. The fact upon which Cox's claim is based is the conclusion that the second Davis bullet was not fired from the gun used in the Watson murder. This conclusion resulted from the ballistics analysis performed by Officers Walker and Cruz. Cox did not discover this fact until Officers Walker and Cruz issued their report on April 30, 2013; it was therefore unknown to him until that date. Cox cannot, however, establish that he could not have ascertained this fact through the exercise of due diligence. . . . Cox's initial attempt to obtain the ballistics evidence was made in his first PCRA petition, in connection with his claim that counsel was ineffective for failing to seek independent ballistics testing. The salient question is whether in so doing, Cox acted with reasonable effort to discover the facts upon which his claim is based. . . . **[T]here is no question that Cox knew that more testing could be performed on the ballistics evidence at the time of trial in 1995. It was not until six years later, in 2001, that Cox first attempted to obtain the ballistics evidence through his first PCRA petition, in connection with his claim that trial counsel was ineffective for failing to seek independent testing thereof.** By raising this claim in his first PCRA petition, Cox has effectively conceded that the testing could have been done at the time of trial. . . . Cox acknowledges that the testing could have been done at the time of trial, but offers no explanation as to why he did not seek such testing at that time. Instead, he took no action to obtain the additional testing for six years. **It is this lengthy, unexplained delay that defeats the possibility of a conclusion that Cox acted with reasonable effort to obtain ballistics testing.**

*Cox*, 146 A.3d at 230-31 (citations and footnotes omitted) (emphasis added).[13]

---

[13] Notably, the *Cox* Court stated:
*(Footnote Continued Next Page)*

- 18 -

Similarly, in **Commonwealth v. Stokes**, 959 A.2d 306 (Pa. 2008), the Court concluded that the defendant could not prove due diligence in discovering files containing allegedly exculpatory evidence, the information upon which his claims were based, because the record revealed that he knew that the files existed for years before he attempted to obtain them. Notably, the **Stokes** Court emphasized that defendant "never asserted that the prosecution (or anyone else) prevented him from gaining access to those files in the [twelve] years between the date his direct appeal was decided and the date he ultimately sought the files." **Id**. at 310-11. "**The defendant's knowledge of the files, absent action to obtain them,**

_(Footnote Continued)_ ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

> Importantly, our review of the record reveals that Cox has never alleged that he asked trial counsel to seek independent ballistics testing or that his counsel refused such a request. **Were that the situation, there could be a basis upon which to conclude that he attempted to act diligently, but that his efforts were thwarted by trial counsel.**

**Cox**, 146 A.3d at 231 (emphasis added). Professor Place certified that he did not believe Dr. Hurst's analysis provided a strong enough basis for filing a PCRA petition, and that in is view, "the strict timeline for filing a PCRA petition would only be triggered by a final expert report." **See** Evidentiary Hearing, 3/27/15, Certification of Witness Pursuant to 42 Pa.C.S. § 9545(d)(1), March 13, 2014, Exhibit P-93, at ¶ 5. He stated that he "needed a more definite report from Dr. Hurst or an opinion from another arson expert." **Id.** at ¶ 6. Professor Place tried to obtain other experts; one did not respond, and the other stated he did not have enough information about the building to reach a conclusion. **Id.** Despite Smallwood's sense of urgency and her frustration with Professor Place, we are unable to conclude that her efforts were "thwarted."

*precluded a finding of due diligence*." *Id.* (emphasis added). The Court concluded:

> Because the record reflects that [defendant] was aware of the files upon which he now relies several years before he ever sought them, and because [defendant] failed to explain why he did not request these files earlier, he did not establish the due diligence required to excuse him from over a decade of inaction. [Defendant] has not explained why it is that he sought the files in 2004, but failed to do so earlier. Nor does he describe how it was that he was able to acquire the documents in 2004, but could not do so before that date. [Defendant] has not satisfied [the] exception[] to the PCRA's timeliness requirement.

*Id.* at 311-12.

In *Commonwealth v. Edmiston*, 65 A.3d 339, 348 (Pa. 2013), the Pennsylvania Supreme Court considered whether a 2009 National Academy of Science report, entitled *Strengthening Forensic Science in the United States: A Path Forward,* ("NAS Report"), which detailed the imprecision of microscopic hair analysis, constituted a newly-discovered fact for purposes of establishing the exception to the PCRA time requirements. There, following a bench trial, the court convicted Edmiston of the gruesome rape and murder of a two-year old child. The court sentenced Edmiston to death. Edmiston sought relief under the PCRA, which the court denied. The Supreme Court affirmed denial of post-conviction relief. *Commonwealth v. Edmiston*, 851 A.2d 883 (Pa. 2004).

On June 13, 2005, Edmiston filed a second PCRA petition, premised upon the coroner's photographs. On August 12, 2005, he amended his second petition. On February 18, 2009, prompted by the publication of the

NAS Report, Edmiston supplemented his amended petition and, following an evidentiary hearing related to timeliness, the PCRA court dismissed the petition with the exception of the claim premised on the NAS Report related to hair comparison analysis. The PCRA court concluded that to the extent the NAS Report contained a specific examination of the scientific support for various methodologies of hair analysis, it qualified as new information under section 9545(b)(1)(ii).

> In this regard, the PCRA court observed that the deficiencies and weaknesses of forensic science are nothing new, and commonly form the basis for attacks on expert testimony in the courtroom. **What was new, in the PCRA court's view, was that these deficiencies have now been collected, investigated, and studied in a report bearing the imprimatur of the NAS. Because the NAS Report was published less than 60 days before Appellant filed his Supplemental Petition, the PCRA court held this claim was timely.**

*Edmiston*, 65 A.3d at 351.

After a hearing on the merits, however, the PCRA denied relief. The court found that the Commonwealth's expert, Bruce Tackett, who had testified that the hairs found in Edmiston's truck exhibited the "same" microscopic characteristics as the hairs he had taken from the victim's head, "did not individualize the hair found in [Edmiston's] truck to the victim, and was therefore not inconsistent with the NAS Report." *Id.* at 351, n.8. Further, the court held that "the newly[-]discovered information in the NAS Report would be useful only for impeachment and, moreover, would not have changed the outcome of the trial." *Id.*

- 21 -

Edmiston appealed to our Supreme Court. Edmiston claimed that the NAS Report's discussion of the "imprecision of microscopic hair analysis," is a newly-discovered fact that undermined "the strength of the Commonwealth's evidence that the hairs found in his truck 'matched' the victim's." *Id.* at 350. The Commonwealth disputed the PCRA court's finding of timeliness under section 9545(b)(1)(ii), arguing that the information on which the NAS Report was based had been "*in existence in the public domain for years prior to being compiled in the NAS Report*[.]" *Id.* at 351 (emphasis added). Therefore, had Edmiston exercised due diligence, that information "could have been discovered by [Edmiston] well before being included in the NAS Report in February 2009." *Id.* The Court agreed:

> As the PCRA court found, therefore, [Edmiston] has not carried his burden of establishing that he was not aware of the factual predicate of his claim at the time of trial and that succeeding counsel could not, with the exercise of due diligence, have presented this claim more than 60 days before he raised it on June 13, 2005. **We cannot say that a petitioner who is aware of the factual basis of his claim but who raises the claim over 15 years later complied with the jurisdictional, statutory requirement to file his claim within 60 days of the date the claim could have been presented**.

*Id.* at 349 (emphasis added).[14] Thus, the Court held that Edmiston had failed to prove the timeliness exception set forth at section 9545(b)(1)(ii):

---

[14] Alternatively, Edmiston argued that if his claims were untimely due to counsel's ineffectiveness for failing to exercise due diligence, then the Court's refusal to entertain the merits violated his due process rights and his

*(Footnote Continued Next Page)*

This Court has addressed the meaning of "facts" as that term is employed in Section 9545(b)(1)(ii) and held that, **to constitute such "facts," the information may not be part of the public record.** Similarly, we have held that a petitioner must allege and prove previously unknown "facts," **not merely a "newly discovered or newly willing source for previously known facts**." These principles have been applied when a petitioner has relied on a study to satisfy the time-bar exception of Section 9545(b)(1)(ii). *See* [*Commonwealth v.*] *Lark*, 746 A.2d [585,] 588 n.4 [(Pa. 2000)] (concluding that because a particular study of the Philadelphia criminal justice system consisted of statistics which were public record, it could not be said that the statistics were unknown to the petitioner).

*Id.* at 352 (emphasis added). *See also Commonwealth v. Whitney*, 817 A.2d 473 (Pa. 2003) (holding PCRA petitioner did not meet newly-discovered facts exception where statistics that comprised criminal justice study were of public record and could not be said to have been unknown to petitioner).

Likewise, in *Commonwealth v. Fisher*, 870 A.2d 864 (Pa. 2005), the defendant relied on the timeliness exception in section 9545(b)(1)(ii) to raise a claim based in part on an affidavit from a retired FBI metallurgist,

*(Footnote Continued)* _____

right to counsel. Our Supreme Court stated: "[W]e have previously rejected attempts to circumvent the timeliness requirements of the PCRA by asserting prior counsel's ineffectiveness for failing to timely raise a claim." *Edmiston*, 65 A.3d at 349, citing *Commonwealth v. Lesko*, 15 A.3d 345, 367 (Pa. 2011) ("[I]t is well established that the fact that petitioner's claims are couched in terms of ineffectiveness will not save an otherwise untimely petition from the application of the time restrictions of the PCRA."). *Cf. Cox*, 146 A.3d at 231 ("Cox has never alleged that he asked trial counsel to seek independent ballistics testing or that his counsel refused such a request. Were that the situation, there could be a basis upon which to conclude that he attempted to act diligently, but that his efforts were thwarted by trial counsel. However, this is simply not the case here.").

which Fisher argued would undermine the Commonwealth's expert trial testimony. The Court reversed the PCRA court's determination that the petition fell within the newly-discovered facts exception to the timeliness requirement, holding "the claim based on the expert's affidavit was not timely because the expert had published his opinions in previous research that had been available and discoverable for more than the two prior years." *Id.* at 871. *See also Commonwealth v. Johnson*, 863 A.2d 423, 427 (Pa. 2004) (exception focuses on facts, "not on a newly discovered or newly willing source for previously known facts").

Applying these principles to the case at hand, we conclude that Smallwood's petition does not meet the newly-discovered facts exception. The methodology upon which Dr. Sutula relied has been in the public domain since 1992, and Smallwood learned of it in 1999; thus, it had been available and discoverable for many years prior to the filing of Smallwood's petition. *See Edmiston*, *supra*; *Cox*, *supra*; *Stokes*, *supra*; *Fisher*, *supra*. Although the methodology has been developed and refined over time, the basic premise of Dr. Sutula's affidavit is that Trooper Sweet "concluded that this fire was incendiary without proper use of methodology to come to that determination." N.T. PCRA Hearing, 3/27/15, at 33. Essentially, Dr. Sutula did not see any evidence that Trooper Sweet used the scientific method. *Id.* at 40.

As noted, the NFPA 921 was first published in 1992, and has been updated on a three-year cycle. The 1992 version of the NFPA 921 focused

on determining origin and cause of fires and explosives using accepted scientific principles. *See* NFPA 921, Guide for Fire and Explosion Investigations, 1992 Edition. The NFPA was revised in 1995, 1998, 2001, 2004, 2008, 2011 and, most recently, in December 2013 (the 2014 edition). It is critical to Smallwood's claim that she prove the science was evolving, and that what Dr. Sutula could testify to in 2014 was significantly different from that which Dr. Hurst could testify to in 1999.

In his affidavit, Dr. Sutula relied on the most recent edition, the 2014 edition. Dr. Sutula's affidavit provides:

> NFPA 921 [Guide for Fire and Explosion Investigations, 2014 Edition] **recommends the use of the Scientific Method when conducting a fire investigation**. Section 4.2 of the 2014 edition states, "This method provides for the organizational and analytical process desirable and necessary in a successful fire investigation. . . . The Scientific Method is an iterative process. Thus, each hypothesis must be tested until it is verified, ruled out, or a determination is made that there is insufficient date to verify it or rule it out. . . . In addition to the use of the Scientific Method, NFPA 921 warns about the inappropriate use of the process of elimination.
>
> * * *
>
> **Thus, in practice, if a proper fire investigation is conducted, any and all accidental fire causes must be considered, tested, and systematically eliminated before hypotheses related to an incendiary fire can be developed. If one or more accidental fire causes remain as a possibility, either because they are consistent with the available evidence or because they cannot be tested due to insufficient available evidence, then the fire cause must remain as undetermined.**

Affidavit of Dr. Sutula, *supra*, at ¶¶ 20–23.

Doctor Sutula went on to explain that the 2014 edition of the NFPA listed examples of observable data that could lead to a hypothesis of an incendiary cause, including "known accelerants, photographic evidence of multiple ignition points separated by portions of the building that are unburned and that have no other accidental explanation, and physical remains of incendiary devices designed to initiate a fire without the presence of an arsonist." *Id.* at ¶ 24. Doctor Sutula noted that the only documentation available were four photos of the exterior of the building and the Pennsylvania State Police Report for Incident #H2-64398, both of which contain no evidence to support the conclusion that the fire that occurred at 11 North Pitt Street in Carlisle was incendiary in nature. *Id.* at ¶ 25. Doctor Sutula also noted that the narrative of the Pennsylvania State Police investigator described the areas where the greatest damage occurred, and this was the only "evidence" that the fire was of incendiary origin. There were no photographs, and there was no evidence that would indicate use of an accelerant. *Id.* at ¶ 27.

Doctor Sutula points out alternative accidental fire causes that the investigation did not rule out, including an electrical fire or an accidental fire, noting in particular the prevalence of cigarette smoking in 1972 and the existence of combustibles, old furniture, including a couch and an overstuffed chair, which were located in the second floor hallway. *Id.* at ¶¶ 31-32.

In his supplemental affidavit, filed on July 7, 2014, in response to the Commonwealth's April 24, 2014 Motion to Dismiss Smallwood's PCRA Petition, Dr. Sutula states:

> The Commonwealth stated that since NFPA 921 was published in 1992, the tools to perform a proper fire investigation were available at that point and Ms. Smallwood should have presented it as "new evidence" at that time. . . . First, . . . the 2014 edition of NFPA 921 is vastly enhanced from the first edition and supersedes all previous editions as the current standard of care. The 2014 edition contains the most recent revisions on fire investigation methodology, the improper use of "negative corpus" and the process of elimination, and the appropriate guidelines for when to classify a fire as undetermined. None of these topics were immediately recognized or common practice in . . . 1992. **Second, a large portion of the fire investigation community was slow to adopt NFPA 921 as the standard of care in fire investigation. Although IAAI [International Association of Arson Investigators] was formed in 1951, the fire investigation organization did not formally accept NFPA 921 as the authoritative guide in fire investigation until January 12, 2013.** Based on the continual revisions and improvements to the NFPA 921 and the 21-year timeframe required for one of the main certifying organizations within the fire investigation community to recognize NFPA 921 as the authoritative guide in fire investigation, Ms. Smallwood would have not known about, understood, or been able to take advantage of the full provisions of NFPA 921 in 1992, and, therefore, would not have been able to present this information as "new evidence" at that time.

Dr. Sutula's Supplemental Affidavit, 7/7/14, at ¶¶ 26-29. Doctor Sutula also noted that the 2014 edition "provides a much more scientifically acceptable framework for completing all aspects of a fire investigation[,] and . . . is the standard of care in the fire investigation community and supersedes all previous editions with regard to proper fire investigation." *Id.* at ¶ 22.

In sum, and as stated above, the NFPA has been continually updated on a three-year cycle, but the basic premise, the use of the "scientific method," has remain unchanged. The essence of Dr. Sutula's affidavit is that there is no indication that Trooper Sweet used the scientific method in his fire investigation, and, consequently, two other causes of the fire, accidental and electrical, had not been ruled out. He does not explain how revisions to NFPA 921 subsequent to 1992 changed the use of the scientific method to alter his basic premise that under NFPA 921 the cause of the fire had to be considered undetermined. Dr. Sutula's affidavit discussing the use of the scientific method over a dozen years after Smallwood became aware of it does nothing more than introduce facts previously known but now presented through a newly discovered source – Dr. Sutula. If we were to accept Smallwood's position that Dr. Sutula's affidavit constitutes the "new fact" to trigger the timeliness exception, petitioners could endlessly file petitions by producing "new facts" through new sources.

We also reject the suggestion that Smallwood's petition was timely because the NFPA 921 standards were not generally accepted until after the International Association of Arson Investigators (IAAI) issued its position statement adopting the NFPA 921 as the authoritative guide in fire investigation on January 12, 2013. The IAAI's 2013 adoption of the standards do not change the fact that the use of the scientific method to study fire investigations was known as early as 1992 under the then-published NFPA standards. *See Edmiston*, *supra* (fact relied upon as

newly discovered evidence is not publication of NAS Report, but analysis of scientific principles supporting hair comparison analysis). Even were we to give Smallwood the benefit of the January 12, 2013 date, her petition was not timely filed within 60 days of that date. *See* 42 Pa.C.S. § 9545(b)(2). In fact, it was not filed until well over one year after the IAAI statement. *See* note 6, *supra*. As Smallwood was required to file her petition within 60 days of when her claims could have been presented, and has not explained why she could not have filed her petition prior to 2014, her petition is untimely. Clearly, the information available in the public domain even as late as January 2013, the date the IAAI formally accepted NFPA 921, would have provided a basis for Dr. Sutula, or any expert, to conclude that Trooper Sweet's classification of the fire as incendiary was premature. Although we cannot state for certain that Dr. Sutula did not opine anything that Dr. Hurst could not have said in 1999, we can positively state that Dr. Sutula did not opine anything that could not have been determined prior to January 12, 2013.[15]

---

[15] Significantly, and as a comparison to the 2014 edition on which Dr. Sutula relies, the 1992 edition of the NFPA sets forth the methodology for fire investigation in section 2-3.6:

> **2-3.6 Test the Hypothesis (Deductive Reasoning).** All other possible origins and causes must be eliminated. The investigator does not have a truly provable hypothesis unless it can stand the test of careful and serious challenge. This is done by the principle of deductive reasoning, in which the investigator compares his or her hypothesis to all known facts. **If the**

*(Footnote Continued Next Page)*

This case is deeply troubling on several levels.[16] There is no doubt in this Court's opinion that the expert currently retained would give an opinion that the fire that occurred on August 29, 1971 was of undetermined origin. From the evidence available and the current state of "fire science," it is likely that the Commonwealth's expert might well concede that fact. It seems axiomatic that a jury hearing Smallwood's statements and the evidence in light of the uncertainty of the origin of the fire might well reach a different conclusion as to Smallwood's guilt than that determined by the original jury who heard Trooper Sweet's testimony that the fire was of incendiary origin.

What remains incomprehensible is why Smallwood, who clearly knew about the advancements in fire science as early as 1999, waited until March 14, 2014, to file a petition for post-conviction relief based upon this new

*(Footnote Continued)* ――――――――――

> **hypothesis cannot withstand an examination by deductive reasoning, it must be either discarded as not provable and a new more adequate hypothesis tested or the fire cause must be listed as "unknown."**

NFPA 921: Guide for Fire and Explosion Investigators, National Fire Protection Association (1992) (emphasis added). ***See supra***, note 2.

[16] We note that Smallwood has maintained her innocence throughout and that we are cognizant of the fact that an indigent, incarcerated petitioner is limited in resources. However, had Smallwood filed her petition in 1999, the court would have appointed counsel, in the interests of justice, even though this was not a first petition. ***See*** Pa.R.Crim.P. 904(D), (E). ***See also*** Comment, Pa.R.Crim.P. 904 ("[T]he rule now limits appointment of counsel on second or subsequent petitions so that counsel should be appointed only if the judge determines that an evidentiary hearing is required. Of course, the judge has the discretion to appoint counsel in any case when the interests of justice require it.").

fact. Even her own expert opines that the 2014 version of the NFPA is a refinement rather than a revision of the 1992 NFPA, so the fact relied upon by Smallwood was in the public domain as early as 1992 and Smallwood knew of it in 1999. Smallwood did not file her petition within 60 days of the 1999 occurrence. Our focus is not on the date the expert published his opinion, but on the petitioner's "reasonable efforts" to bring forth the newly-discovered fact of the NFPA 921 standards based on the information that was publicly available and accessible to her, and any number of experts, for years.

There is nothing in the record before us to indicate that Smallwood's valid rationale for Smallwood's failure to file a timely petition. It is not alleged that lack of funding impeded her from filing a petition. There is evidence that Professor Place may have asked Smallwood to wait for an affidavit from her expert prior to filing her current petition, but that is not a ground for relief advanced in this petition, and even it if were, layered ineffectiveness would not confer timeliness on an otherwise untimely petition. In short, Smallwood has not advanced any theory that would fall within any exception to the rule of timeliness for filing a PCRA.

We conclude, therefore, that Smallwood knew or had reason to know of NFPA 921, the newly-discovered fact, prior to 2014, in fact, in 1999, and thus her knowledge precludes a finding of due diligence under section 9545(b)(1)(ii). **See Stokes**, 959 A.2d at 310-11 (knowledge of facts, absent action to obtain them, precluded finding of due diligence); **see also**

*Edmiston*, 65 A.3d at 348, 352 (PCRA petitioner cannot establish due diligence based on alleged newly-discovered photographs where record reveals petitioner knew photographs existed at time of trial but did not raise claim until fifteen years later; petitioner must allege and prove previously unknown "facts," not merely provide newly willing source for previously known facts). Because Smallwood cannot establish that she acted with due diligence, she has failed to meet the section 9545(b)(1)(ii) exception to the PCRA's jurisdictional time-bar. Smallwood's PCRA petition is, therefore, untimely, and the PCRA court did not have jurisdiction to reach the merits of her claim. *Fahy*, *supra*.

Accordingly, we reverse the PCRA court's order granting a new trial.[17] Jurisdiction relinquished.

Judge Dubow did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/1/2017

---

[17] In light of our determination that Smallwood's petition is untimely and thus the PCRA court had no jurisdiction to entertain it, we need not address the remaining issues the Commonwealth raises on appeal.